OPINION
Defendant-appellant Denise Heckman appeals from an order of the trial court overruling her motion to enforce a "prosecutor's agreement." Heckman, who pled no contest to one count of Aggravated Trafficking, was found guilty, and was sentenced to two years imprisonment and fined $7,500, contends that the trial court erred when it denied her motion to enforce the terms of an agreement she had reached with the State. The trial court held an evidentiary hearing on her motion. Following the hearing, the trial court denied her motion. Heckman contends that the trial court erred when it denied her motion to enforce the terms of her agreement with the State, which would have permitted her to plead to a lesser charge and possibly avoid prison.
We have reviewed the transcript of the hearing, and we conclude that there is evidence in the record from which the trial court could have found, as it did, that the State, as well as the defendant, made reasonable efforts to carry out the agreement, but that, through no fault of either party, the agreement could not be carried out. Accordingly, the judgment of the trial court is Affirmed.
 I
Heckman was charged by indictment with ten counts of drug-related offenses. She entered into a written agreement with the State. Although it is not disputed that the defendant, a representative of the prosecutor's office, and Moraine police officer Tracey Harpster all signed that agreement, it was never offered in evidence, and is not part of our record. The agreement provided that Heckman would be allowed to plead guilty to a lesser offense, for which a prison term would not be mandatory, if she succeeded in making a controlled buy of drugs that would constitute an offense more serious than those with which Heckman was charged. The State further agreed that it would remain silent with respect to sentencing.
Heckman initially identified a doctor as a person from whom she believed she could make a controlled buy. When this possibility was discussed, however, it became clear that the transaction envisioned by Heckman would involve the doctor in professional, but not criminal, misconduct.
Heckman and her fianc´, Carl Ludwigsen, to whom she is now married, then identified an individual by the name of Reyes Grant as someone from whom Ludwigsen would be able to make a controlled buy. Arrangements were made for the controlled buy, but it never came to fruition.
Heckman then identified another individual from whom she thought she might be able to buy drugs, but she indicated that it would first be necessary for her to purchase smaller quantities of drugs from a prostitute who worked for this individual. Harpster indicated that this would not be satisfactory, and no further efforts ensued to make a controlled buy pursuant to the terms of the agreement.
Heckman then filed her motion to enforce the prosecutor's agreement. Both parties filed memoranda and affidavits supporting and opposing the motion, respectively. The Honorable Adele Riley denied the motion, without a hearing.
Heckman attempted to appeal from the order denying her motion, but we dismissed the appeal for lack of a final appealable order. Thereafter, Heckman pled no contest to one count of Aggravated Trafficking as a lesser-included offense of one of the offenses charged in the indictment, and the State dismissed all other counts. Heckman's no contest plea was accepted, and she was found guilty.
On February 16, 2001, Heckman appeared for sentencing before the Honorable Michael Tucker, who had succeeded Judge Riley. Judge Tucker conducted an evidentiary hearing on Heckman's motion to enforce the prosecutor's agreement. From the transcript of that hearing, it is clear that Heckman was on notice that her motion to enforce the agreement would be the subject of that hearing, despite the fact that her motion had earlier been denied, by a different judge, without a hearing. Harpster testified at this hearing on behalf of the State; Heckman, Ludwigsen, and Kathleen Cokley, a friend of Heckman, testified on her behalf. Following this hearing, Judge Tucker found that the State had made reasonable efforts to accomplish the terms of the agreement, and proceeded to sentence Heckman for the offense for which she stood convicted.
Heckman appeals from the denial of her motion to enforce her agreement with the State.
 II
Heckman's sole assignment of error is as follows:
 THE TRIAL COURT DID ERROR [SIC] IN FINDING APPELLANT WAS NOT ENTITLED TO ENFORCE THE PLEA TERMS OF A PROSECUTOR'S AGREEMENT IN WRITING WHERE SAID APPELLANT HAD FULFILLED HER PART OF SAID AGREEMENT BUT SAID AGREEMENT FAILS DUE TO THE FAULT AND/OR NEGLIGENCE OF APPELLEE'S AGENT.
It is undisputed that Heckman, a representative of the prosecutor's office, and Moraine police officer Tracey Harpster signed what was denominated as a "Prosecutor's Agreement." Unfortunately, that written agreement was never offered in evidence, and is not part of our record. Nevertheless the essential terms of the agreement appear to be undisputed. The State asserts, and Heckman does not deny, that the agreement was contingent upon a controlled buy occurring that would constitute an offense greater in degree than the offenses with which she was charged. It is undisputed that a controlled buy never occurred. Heckman asserts, and the State does not deny, that the agreement required that both parties make reasonable efforts to bring the controlled buy to fruition. At the hearing, the State's sole witness, police officer Harpster, conceded that Ludwigsen, then Heckman's fiancé, had made reasonable efforts on her behalf to bring about the controlled buy. The issue on which the parties did not agree, which was the crucial factual issue at the hearing, was whether the State had made reasonable efforts to bring about the controlled buy upon which the agreement was contingent.
Moraine police sergeant Tracey Harpster testified on behalf of the State. To some extent, his testimony was controverted by testimony offered on Heckman's behalf. We have reviewed the entire transcript of the hearing, and we are satisfied that Harpster's testimony is not inherently lacking in credibility in any respect, so that the trial judge, who saw and heard the testimony, was entitled to credit that testimony in full, as he evidently did. Harpster testified that when it became clear to him that the initial proposed transaction, with the doctor, would involve merely an ethical, rather than a criminal violation, he rejected that as not satisfying the terms of the agreement. Heckman then proposed Reyes Grant as the target of a controlled buy. Because Ludwigsen, Heckman's fiancT, knew Grant, it was understood that Ludwigsen was going to make the buy. This was satisfactory to both parties. It was after this that the prosecutor's agreement was signed. Pursuant to the terms of that agreement, a transaction constituting an offense more serious than the ones with which Heckman was charged was required, and this would have required a transaction involving more than one ounce of crack cocaine.[1] In return, Heckman would have been allowed to plead to a lesser charge, with probation elibibility, and the State would remain silent as to the sentence.
At this time, the target was only identified by his nickname, "Nex." It evidently took some detective work to determine that his real name was Reyes Grant.
On March 29, 2000, a controlled buy plan, with Grant as the target, was prepared, and $3,200 in currency was photocopied. The plan involved several hours of work. Out of safety concerns, numerous officers were required, including five to six people in Harpster's unit, plus three or four marked units. The deal was set up to take place at the General Motors parking lot in Moraine at 6:30 p.m., April 5, 2000. With everyone in place, the target did not show up. According to Harpster, "we gave it several hours," before giving up. Before the effort was abandoned, there was a phone conversation between Ludwigsen and the target, in which the target indicated that he only had one ounce to sell. Harpster nevertheless approved proceeding with the plan, but the target still did not show up.
The next day, Ludwigsen talked to Grant, the target, over the phone. This telephone conversation, along with others, was taped. Grant indicated that he did not want to do the deal at General Motors, but expressed willingness to sell cocaine at a restaurant called Chicken Louie's, in Dayton, where Grant was apparently eating, but only if Ludwigsen could get there in the next fifteen minutes. It was not possible to set up a controlled buy in fifteen minutes. It would have taken at least twenty-four hours to arrange a controlled buy in a different jurisdiction.
Harpster described further attempts to make the buy with Grant, also known as Nex, as follows:
 Q. All right. Now, as a result of not being able to make a buy with this Nex, were any other attempts made with him to buy?
 We — we continued to try with Nex. We tried several times. Uh . . . I'm used to the first time, or the second time, the target not coming through. That's — that's not that unusual.
Q. Okay.
 A. Uh . . . and we kept trying. And Carl kept calling him. We kept taping it. And it just never happened. And — which is very common, uh . . ., uh . . . I can't say that I was, uh . . . shocked by that, because it's common that, uh . . . a drug dealer says he can do something and then he doesn't do it.
 Q. Okay. So, it's not unusual for these types of things to not be able to be performed?
A. Th — that would be the majority of the time.
 Q. Okay. What — if you could remember, what were the reasons why these other talks with Nex weren't able to be set up?
 A. Uh . . . in my opinion, I think that Nex thought — that Mr. Grant thought that something was fishy with the informant. And on one occasion, I remember after the first couple times didn't go through, uh . . . he said he had one ounce that he would sell. And Carl said: "Well, how much — how much do you want for it?" And — the price of an ounce of crack cocaine in Dayton is about seven hundred dollars . . .
Q. Mmm. Hmm.
 A. . . . eight hundred dollars, depending who ya' know, and wher — what type it is. And, uh . . . the deal that we had had for the four ounces was gonna be thirty-two hundred dollars, which was — which was fair. A little high.
 But when he — on the following occasion, when he said: "Well, I only got one," and Carl said: "How much is it?" He said: "It's gonna cost ya' two." Meaning, two thousand dollars. Only a police officer would pay two thousand dollars for an ounce of crack cocaine.
 And I — in my opinion — and I have some experience in drugs, I think that, uh . . . Nex was fishing out to see if the cops were involved. And Carl said: "Okay, I gotta do what I gotta do. And, uh . . . I'll take it." But the deal just did not go through.[2]
 Q. Okay. So, after all these attempts to set up another buy with Nex and — which failed, wh — did ya' stop at that point, or what happened then?
 A. No. And — and, as a matter of fact, during this process with — with, uh . . . Mr. Grant, I spoke to Miss Heckman and Carl. And I told them that, it's my — in my experience, it's best if you have a couple targets out there, not just one. Because, ya' know, if you put all your eggs in the one basket, and it fails, then you're stuck.
Q. Mmm. Hmm.
 A. And I encouraged them to find other targets of the level that Nex was. Or that they were.
According to Harpster, the only further communication with Heckman was when she identified another person that she might be able to make a significant cocaine buy from, but she said that she would have to make several small buys from a prostitute working for that individual first. Harpster was then asked why he did not want to pursue that:
 Q. Okay. And why would — why didn't you wanna do that?
 A. This prostitute was in Dayton and we did not have the time and resources to make several small buys at an unknown prostitute just in the hopes that we could arrest her and flip her to get her — one of — the dealer. And in my experience, that's never works [sic].
 And in my experience, uh . . . it was a long shot at best that we could make buys from her and get her to flip on someone of that magnitude.
 Q. All right. So, you're to the point now that no longer is the Defendant doing the buy or the boyfriend doing the buy. You're now having other people having to do — oh, fulfill the Prosecutor Agreement for them?
 A. Now, we're placing our hopes on a prostitute to flip on a major drug dealer.
 Q. Okay. So, based on that, you decided not to even do that?
A. Based on that, I said I will not do that.
 Q. Okay. And was that prostitute ever part of the Prosecutor Agreement?
A. No.
 Q. Okay. Now, did you have any other further conversations with the Defendant regarding any other people that she had that you wanted to try to give . . .
 A. I don't believe I've heard fr — I heard from her again.
On cross-examination, Harpster acknowledged that Heckman had told him that she thought she might be able to buy an ounce of cocaine from the last target, the one who had the prostitute working for him. Of course, Harpster had previously testified that the agreement called for a controlled buy of more than an ounce of cocaine.
Heckman's witnesses contradicted Harpster in several respects. Probably the most important contradiction was their testimony that Harpster insisted that the drug deal had to take place in Moraine, not Dayton. However, we find nothing in Harpster's testimony that is inherently unworthy of belief. The trial judge, who was able to see and hear all the witnesses, chose to credit Harpster's testimony. The trial court expressed its reasoning as follows:
 I've listened carefully to the testimony, and I believe that what — first of all, before I get into what I conclude the testimony established, I believe that the standard that has to be applied in this situation is a rule of reason. I believe that the State of Ohio has to make reasonable efforts to accomplish the deal. That doesn't mean they have to go to extreme efforts to accomplish the deal, but they have to make more of an effort than a cursory effort. They have to make a real effort. A reasonable effort.
 And based upon the testimony that I have heard, it is my conclusion that the State of Ohio made reasonable efforts to conclude the deal. Unfortunately, and I think it's clear that — and I'm gonna call him by the name that was most commonly used on the record — unfortunately, I believe that Nex, for whatever reason, got spooked. He thought something was up. And I don't believe that that deal with Nex was ever going to occur.
 And I note that the deal with Nex was — was attempted only after the original deal regarding a doctor in Moraine did not come about because it was determined that what the doctor was or was not doing may have been a [sic] ethical violation, but was not, in fact, a violation of law.
 And it was — it was the clear intent of — of the parties entering into this Agreement that the cooperation would result in the arrest and ho — and hopeful conviction of someone who had violated the drug laws of the State of Ohio.
 Now, let's go to the — the — and again, my factual determination as to what I'll call the Nex deal — N-E-X deal, is that the State of Ohio made reasonable efforts to accomplish that deal. Certainly Ms. Heckman and her boyfriend made more than reasonable efforts to get that deal accomplished. It just — it just didn't occur.
 Now, going to the — the — probably the primary determination that — that has to be made in this case and that is this: Was the State reasonable in not following through with the request by Nex that a sale occur at Chicken Louie's in a very short period of time cafter the recorded phone conversation between Carl and Nex where Detective Hap — Detective Harpster was also participating?
 It is my conclusion that it was unreasonable and not possible, really, for the police to accomplish that deal within a matter of fifteen or twenty minutes. And it's also my conclusion, based upon what I have heard, that no deal with Nex was ever going to be accomplished in a reasonable fashion, because he was spooked. And I think that the State makes a good point when they indicate that the selling price that was put out there, was a fishing expedition, if you will, by Nex to de — make a determination of whether or not this was a real deal or a deal where there could be police involvement.
 And given the testimony, which was unrebutted, that at that time an ounce of crack cocaine would sell for seven or eight hundred dollars, the fact that this — that Carl was asked to pay two thousand dollars by Nex for a ounce of crack cocaine, leads this Court to the conclusion that what Nex was trying to do by that conversation was to make a determination of whether or not this was a legi — for lack of a better word, legitimate deal, or a deal where the police were involved.
 And so, I believe — and I state for the record, that I have made the factual conclusion that the — that the State of Ohio, through the Moraine Police Department, made a reasonable effort to accomplish the deal with Nex.
 As to the final deal, that deal, really, if you — if you wanna get technical about it, was not even in compliance with the Agreement — the Prosecutor's Agreement that we're here to deal with. The only amount that was ever mentioned was one ounce, which really wa — would not be in technical compliance with the Agreement, number one.
 Number two, it would have involved a situation where there would have to have been intermediary buys at a lower level to perhaps get to a higher level individual. Again, I — the Court makes the factual determination that it was not reasonable for the — for the Moraine Police Department and the State of Ohio to go through that series of events and that there was no obligation on their part to do so.
In short, although the evidence was conflicting to some extent, we are satisfied that there is evidence in the record to support the trial court's conclusion that the State made reasonable efforts to bring to fruition its agreement with Heckman, who also made reasonable efforts. Unfortunately, the agreement could not be consummated. Therefore, neither party was bound by the agreement, and the trial court properly denied Heckman's motion to enforce the agreement against the State.
Heckman's sole assignment of error is overruled.
 III
Heckman's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.
WOLFF, P.J., and BROGAN, J., concur.
[1] The offenses with which Heckman were charged appear to have included first degree felonies involving methadone transactions. Transactions involving in excess of 100 grams of crack cocaine are first degree felonies with additional "major drug offender" incarceration possible. R.C. 2925.03(C)(4)(g). Thus, a transaction involving more than 100 grams of crack cocaine would constitute the more serious offense required by the agreement. One ounce equals 28.35 grams, so it would appear that the agreement required a transaction involving just over three and a half (3.527) ounces.
[2] Ludwigsen testified that he was told, in his initial orientation, not to haggle over the price, but to accept whatever terms were proposed. It appears that Ludwigsen was not in touch with the police when the conversation to which Harpster is alluding took place. Perhaps the police would have advised Ludwigsen, in this situation, not to accept the sudden increase in price. We conclude that the situation in which the target may have "smoked" out the fact that the proposed transaction was not, in the ironic terms used by Judge Tucker, a "legitimate" transaction, was not the result of fault by either Ludwigsen or the police.